Good morning, Your Honors. Tom Barth for Hynes, Hynes Aviation Industries, and Hynes Children's Trust Fund Limited. May it please the Court. Oh, and I might point out, I'm anticipating needing approximately three minutes for rebuttal. So I'll be trying to manage my time in that regard. May it please the Court. There are a number of issues raised in the appeal, and additional issues raised in the cross-appeal. And I don't mean to, I'm going to go to one issue in particular to illustrate one of the points raised in the briefing. But I don't mean to skip past or reduce the significance of even the threshold issue of the statute of limitations, because a great deal of what we're arguing about with respect to constructive fraud as a basis for recovery in particular, and breaches of fiduciary duty that amount to constructive fraud, would be barred by the statute of limitations if our appeal on that ground prevails. But going past that, what I wanted to address I did want to ask you one question about that. Even a claim that is, as an individual claim, is barred by the statute of limitations, if it's an offset, the statute doesn't preclude it, right? Correct. So then, what I wanted to go to is on the application of Missouri law, in particular on leases one through nine of the first master lease. There are three master leases here, and the first master lease concerns leases one through nine. One of the key points, foundations for Judge Newman's decision not to enforce leases one through nine, and also actually to command that payments be disgorged on those leases, was the position taken by the court that on the face of the lease, the written lease agreement doesn't allow a party to sublease, doesn't allow a lessee to sublease to another lessee. And so, therefore, the court reasoned that the purported assignment by Heinz Aviation Industries, I'll refer to as HAI, to Heinz Children's Trust, fund limited, in January of 2005, was considered ultimately by the court to be in violation of that lease provision, the lease agreement. And Missouri law, I've argued in the appeal on a number of different points about the court's failure to apply Missouri law, but there's a particular section, actually, of the commercial code in Missouri law that directly addresses that particular issue. And it's section 400.2A-303. Section 303 is entitled Alienability of Party's Interest Under Lease Contract. In part, that's the title. In summary, what section 303 says is that a provision in a lease that forbids the alienability by either the lessor or the lessee of their interest in the lease is not to be enforced as such, but that the actual transfer, and it includes on the face of the section, including a sublease, is effective, notwithstanding the contrary lease provision in the lease agreement, subject to a potential application or imposition of damages under section 4B of section 303, subdivision 4B. There's many issues here. Yes, Your Honor. So I just want to make sure I'm focusing on the one that you're arguing here. And is this under, on whether the district court erred in its findings and conclusion with regard to the equipment leases? That's correct, Your Honor. So specifically, you're arguing that, I think the argument you're making based on the briefs is that the January 2005 HAI was a lessee under the equipment. Is that what you're arguing here? The district court found that the transfer, the assignment of HAI's interest as a lessor to HCTFL, the Heinz Children's Trust, was ineffective, was illegal, the court reasoned, because it violated an express provision of the lease agreement. And we have to find clear error. Correct. Okay. And so tell me why there was clear error, now that I've got it figured out. Right. I've argued it quite a bit in the briefs, but I want to bring the court's attention to specifically says that written provisions in lease agreement that forbid alienation of either lessor's or lessee's interest, in this particular case, we're concerned about an express provision that forbids alienation of the lessee's interest, that those are not to be enforced, and the actual alienation, in this case, as the district court found, a sublease, is effective and is to be given effect, subject to just a question of whether the other party, in this instance, SAC-EDM, actually suffered any damages as a result of that sublease. And the record is clear, there's no evidence at all, in this case, that SAC-EDM suffered damages. In fact, SAC-EDM, I had argued in the briefing that on the course of performance, so the course of five, six years, SAC-EDM continued to pay for these leases because it included, in leases one through nine, there were three of those leases that included equipment purchased, actually, by HAI that SAC-EDM could not have otherwise bought. And then all of them, all of that equipment was in the possession of and used by SAC-EDM. I mean, frankly, the definitions in the Missouri Commercial Code define the lessee as the part in possession of the equipment. And so it's clear under the Commercial Code that SAC-EDM was at all times a lessee and therefore obligated by the lease contract, which is the bundle of obligations the parties to pay for the equipment. It appears, at least in your briefing, that you do not address the additional sort of master and individual leases, which is what the district court based its conclusion on. So I'd like to hear from you, at least today, to address, because I don't think you did that in your brief. Yes, Your Honor, and the reason for that is, Your Honor, that the fundamental assertion of error by the district court is that Judge Newman did not address or apply or consider the application of Missouri law. And Missouri law is clear that the lease relationship between a lessor and a lessee is defined by many things. Frankly, it's defined in one instance by the express provisions of written agreements. That's the lease agreement. But the lease contract, which is that bundle of obligations and rights of the parties under the definition of the commercial code in Missouri, is beyond the actual written lease. In other words, it includes the course of performance and the course of dealing between the parties. And the evidence in this case is very clear that the parties acted at all times, or in particular for Sac EDM, acted at all times as the lessee, having possession of the equipment, paying for the equipment, and not disputing the obligations under the lease agreements. This argument goes to leases 1 through 9, not 10 through 20. 10 through 20 was not, the court enforced 10 through 20, but applied the usurious reduction from 30% to 10% in the damage calculation. I understand. Right. Yes. On leases 10 through 20, at least on the finding of breach or breach of fiduciary duty, you'd have to show that the finding was clearly erroneous, that Dr. Hines breached his fiduciary duty with respect to the terms of those leases, the unfavorable terms of those leases. True? True. Well, and that was, the limitation placed by the court was based on a finding of factual finding that Dr. Hines misrepresented the rate of interest, that's the 30%, and the duration. And so the argument on appeal about the clear error of the factual findings is that, in reverse order, the duration, it was clearly expressed that the calculated lease rate was calculated on the basis of 60 months, and frankly that's what the court ultimately used as the duration. But one thing the court concluded clearly erroneously was that there was no right of early termination, and that was right on the face of the leases, that the leases could be terminated and without penalty. The finding was, as a practical matter, they can't because they don't have the money, and that the contemplation of the parties was this would run its course, right? Actually no. The finding was that the lease actually could not be terminated legally. Until SAC-EDM had paid enough for 50% of its payments to equal the cost of the equipment plus 10%. And so it was a finding by the court that there was a legal prohibition on the face of the lease against early termination, and there's not only the face of the lease, but also numerous writings, even initialed and signed by Mr. Folk, that the lease could be terminated early, and the way that he could do that would be to pay, or he'd be given credit for 50% of his payments, and then he'd pay the balance plus the 10%. And actually what's even shown that Mr. Folk understood that was starting in 2009, I believe, definitely in 2010, he actually said he wanted to terminate the leases early, and that parties discussed the reasons why they should go forward in their relationship, and Mr. Folk decided to proceed with the leases. Dr. Hines talked him out of it again. Told him why it would, and actually at that point, this was after starting in 2009, Dr. Hines had reduced the lease payments from $10,000 to $6,000, for instance, a month, and was giving him concessions where he didn't have to pay substantial amounts for extended periods. So the nature of the relationship wasn't unconscionable. It doesn't meet the test of unconscionability as the court found. That test is to prevent oppression and unfair surprise, not the disturbance of the allocation of risks because of superior bargaining power, even. That's the legal test. So you're right. I wanted to bring the court's attention. I've argued to address your question that the failure by the district court to apply and actually consider the impact of the Missouri law is critical because the lease relationship between these parties is not just defined by the agreements, no matter how internally in conflict they may be. The lease relationship also is defined by their course of performance. I see I'm at 2 minutes and 30 seconds, so I better save the rest for rebuttal. Thank you. Good morning, Your Honors. May it please the Court, my name is Sean Gavin. I represent MAC EDM and Dan Folk. A couple points real quick. I think my colleague just cited to Missouri statute section 400.2-303, I think is what he said. That's not cited in the briefing anywhere. I'm not familiar with that statute to the extent that he cited 303, this idea that the Missouri law forbids a contractual obligation or contractual bar on transferring any of the rights or interests. So that would be a problem if it's not raised in the briefing and argued here today. I want to ask you a factual question about the leases. Yes, sir. There's all this talk about 30%. Yes, sir. And it's just not 30%. Let me, I guess, tee it up and get you to tell me what's wrong with this. The 30% was added to the payment, but this is a five-year plan. If you divided it up evenly, 30% over five years is 6% per annum. Nobody has done 30% per annum. And in fact, if you look at the interest payable in the first year, it's 16%. It's not 30%. Now, the rate goes up because you don't take into account that the principal is going down. But I'm trying to understand how anybody gets the idea that 30% has something to do with the rate on this financing. Sure. So the way that the repayment was structured was this. They took a piece of equipment, just say it was some water jet, and they assigned a value to it, say $20,000. Well, let's say $6,000. The arithmetic's better. $6,000. And then they took $6,000 and they divided that by 60. $100 a month. And came up with that monthly payment. And then to that, they added 10% for interest, 10% for overhead, and 10% for profit. 30% earnings, so that's $30. $130. And then they said, that's the monthly payment amount. And you have to make that monthly payment amount until you buy the equipment back. And the condition upon which you will buy the equipment back is your payment of that original amount, $6,000, plus another 10%. Because somehow equipment goes up in value over five years instead of down in value. So now this equipment appreciates it. I understand how it works. So here's what it seems to me to be pretty easy accounting. The first month's payment's $130. 30 of that is profit. $50 never gets applied to the purchase price. $50 does get applied to the purchase price. That's the half of the 100. Maybe it's 65. 65, that's right. 65 gets applied. So 35 doesn't get applied. And 30 is profit. That's $65. You multiply that by 12, that'll tell you how much interest you paid in the first year. And it's not going to be 30%. It's not going to be 16, because I did 50 instead of 65. But it's not going to be 30%. Yeah. I think the point that the district court correctly found is that it's also not 10%. And that's what the contract was sold to my clients as, was this is 10% interest. And they weren't paying 10% interest. They were paying more than 10%. I mean, nobody noticed that this was 10% over five years as opposed to 10% in one year? I mean, interest per annum is per year. If you're doing math over five years, it just doesn't work that way. Again, I think that it was sold to my client as 10% per year. And then that's what the district court said, that's what's fair, is 10%, because that's what the parties had agreed to. There was a meeting of the minds that it would be a 60-month term at 10%. And so the district court said, we're not going to let you charge more than that. And if I get 10% doing the arithmetic the way the parties did, so add 10% to the payment, that's how the district court did it? So the district court outlined in its order how it calculated the interest. And as Judge McGee pointed out, there are many, many issues here. I have a couple issues that we had raised affirmatively in our briefing that I would like to address, if I may.  And thank you. There are five issues that we raised in affirmative appeal. Three of them I'd like to talk about today. The first is that the district court found that Dr. Hines committed a breach of his fiduciary duty and constructive fraud in the course of his consulting relationship with my clients, and yet still allowed Dr. Hines to collect every penny of his consulting fee. And that's not fair. We cited two case law, County of San Bernardino v. Walsh, that says that when you breach your fiduciary duty, and that leads to ill-gotten gains, you have to discourage all of those gains. And so the district court committed error in that regard. It should not have found that Dr. Hines committed fraud and breach of his fiduciary duty in the course of his consulting, and then said, oh, but also he gets to get paid every penny. He got paid hundreds of thousands of dollars to self-deal. And allowing him to keep all of that amounts to rewarding that conduct. So we think the district court committed error in that regard. Secondly, with respect to the repayment of the operating loan, the district court found that Dr. Hines and his companies made operating loans to my clients at GDM in just over $500,000 in order that my client repay that amount. Fair. Fine. My client got the money. He should repay it. But getting that much money was only necessary because Dr. Hines was overcharging on the equipment leases and charging my client for the U.S. Bank judgment. If you remember, the U.S. Bank judgment was the situation where Dr. Hines orchestrated him owning a judgment against my client and then saying, well, you have to repay the full judgment plus the $50,000 you paid me for the privilege of having me be your creditor instead of the bank. So the district court found that that was a commission of a breach of fiduciary duty and fraud, and then said, still, even though the money that was being lent that eventually added up to $512,000, the money that was being lent that added up to that much was only lent in that amount to service debts that were incurred by fraud, you still have to pay back the full amount plus interest on that. And that makes no sense because that rewards the fraudulent behavior in the form of collection of interest on the artificially inflated amount. If Dr. Hines had not committed his fraud, he would not have been able to collect any money on the U.S. Bank judgment, and he would not have been able to collect $413,000 in the equipment leases. That's what the district court found, that $413,000 in change of payments from my client to Dr. Hines and his companies was based on these equipment leases that should never have been transferred. So my clients paid over $600,000 in the service of debt that was the result of a breach of fiduciary duty and fraud, and you've got the money, the $512,000, so you have to pay it back. And as I said, all right, fine, my client got the money, he should pay it back. But then my client has to pay almost $300,000 in interest on that, $291,000. I said, wait a minute, what if it wasn't $300,000? What if it was $3 million? What if the amount that was loaned wasn't $500,000? What if it was $5 million or $50 million? Because at some point my client was just a conduit. Dr. Hines was lending money to my client, my client was paying it right back to Dr. Hines. So it didn't matter what the amount was, whatever my client got, he paid out. It could have been $5 million or $50 million, and the interest then would have gone up. Instead of $300,000, it would have been $3 million or $30 million. And according to this district court ruling, my client would have to pay back the interest on that. It not only encourages and rewards that behavior, it incentivizes fraudulent behavior. It incentivizes Dr. Hines or somebody like him to do it exactly the same way to somebody else later and then say, well, I get interest on the money that I lent even though I only lent it in that amount because of my fraud. And that makes no sense. And the third issue I want to talk about is the life insurance policies. The district court's finding doesn't animate the agreement and the meeting of the minds of the parties. Dr. Hines is the one who said, we need key man life insurance on each other because if either one of us dies, the operation's not going to be able to run properly. I don't want my family getting stuck with this giant operating loan of $200,000 or $300,000 or $400,000 or $500,000. And in addition, if you die and we can't run the operation, I don't want your wife and your kids to have to pay me back the operating loan. So here's what we'll do. We'll take out key man life insurance policy and we'll agree that the death benefit will get used to retire the operating loan, whatever it is. Okay, that's what the parties agreed to. And then what the district court says is that, well, my client has to pay the premiums on the life insurance even though he asked in June of 2009. He said, I don't want to do this anymore, this life insurance thing anymore. You're committing fraud. You changed this to a whole life policy. You own it. This isn't what we agreed to. Dr. Hines says, no, I'm not going to change it. Tough. And he continues to bill for it. The district court says, well, SecuDM still has to pay that amount and pay the premium, but now Dr. Hines gets double the benefit because he has an order that says my client has to pay back the full operating loan. So if my client pays it and pays half a million, then when the death benefit triggers, which it will trigger because it's a whole life policy, and Dr. Hines is guaranteed to die at some point, when that triggers, his estate will get another $500,000. But you think the order requires SecuDM or Mr. Faulk to continue paying the premium going forward? Yes, that's what the order should say. It should say SecuDM has to continue to pay the That's not what it says. They can stop. So going forward, if Dr. Hines wants to keep the policy, he has to pay the premium. True? Sure. That's what the order says presently. And so what the order should say is one of the following. The first is what Your Honor identified, that SecuDM has to continue to pay the premium and then get the benefit that the retirement of the operating loan happens upon the death benefit, which there's no reason to make it happen then. Just make it happen now. Or, number two, find that SecuDM doesn't have to pay the premium from the time that it asked to stop the policy in the first place, which was June of 2009. The date that the judge inserted as the last date upon which SecuDM has to have paid the premium is the date of the order, April of 2017. That's a totally arbitrary date in relationship to the life insurance policy. Why is that date? When did my client stop getting the benefit of the bargain? The benefit of the bargain was upon the payment of the death benefit, the retirement of the operating loan will happen. Is there anything in the record that shows what the value of the policy is now? No, because Dr. Hines never produced the policy and Judge Newman gave him a pass on that. He never produced the policy. It's not part of the record. So it shouldn't be that my client has to pay the premium and then not get any of the benefit. The other, like I said, those are the three major points that I want to talk about. There are two minor points as well. One of them is with respect to the prevailing party on the equipment leases. Missouri law provides for two different analyses on who the prevailing party is on equipment. Before you get to what the law is on who the prevailing party is, I couldn't find a prevailing party fee provision, at least in the master lease. Now, I don't know that I've gone and looked at all the subsidiary ones. Is there a provision in the lease agreement that provides a prevailing party gets fees? Yes, sir, there is. How did I miss it? Just not, wouldn't be the hardest thing I ever missed. Sure. Unfortunately, I'm not able to tell you the exact page in the record. But you think if I go to a master lease, I will find a prevailing party fee provision? If you go to the leases, it's in there. And in fact, neither party disputes that. I know. I just went and looked and I couldn't find it. Fair enough. I don't have anything for you other than to say it is in there. Fair enough. Thank you. And with respect to assignment of a prevailing party, the district court should have applied Missouri law, which provides for two different methods of analyzing who the prevailing party is in a contract. The first is what the court calls the main issue analysis. And that just looks at it and says, well, who won this issue? On these equipment leases, it's hard to say because there were 20 leases. On nine of them, my client won. On 11, they won. And it's the prevailing party with respect to the main issue of the leases. But the other analysis is the net prevailing party analysis. And that looks at the dollars and says, well, who got more? Well, here, that can be done with precision. Here, my client got $413,000 in change and owes about $80,000. So in the net prevailing party analysis, there can be no question that my client was the prevailing party. Go ahead. No, no. I'm just saying, does the Missouri law give the court the option on which to apply? Yes. Yes. The Missouri law provides for two different methods. And this was raised in our briefing. So why did... I'm just trying to figure out how the district court erred here. The district court didn't... Because it went with the split, it seems like. Well, but it didn't. The district court didn't make any finding as to who the prevailing party was. The district court didn't say, on some issue, SAC-EDM is the prevailing party, and on the other issue, Dr. Hines is the prevailing party. And as a result, they owe each other attorney's fees. And I think that the attorney's fees in this case would be pretty equal, and so they're going to offset each other. So the court didn't find that. The court didn't do a prevailing party analysis at all. And that's the error, is not doing it. I thought it generally just said that because everybody... Well, you saw what the district court said here, that nobody wins here, basically. I just interpreted that for the court to have applied the prior instead of the latter. Well, the prevailing party analysis is a zero-sum game. You can't have neither party be the prevailing party. And so that's why there's either the main issue analysis, which it seems, I agree with you, it seems that the court said, I can't really decide on the main issue. So then the court should have went to the net prevailing party analysis and said, the party that won the most is the prevailing party. But the court didn't do that. I mean, I characterize it as a punt. Judge Newman kind of punted on the issue of attorney's fees and the prevailing party analysis. He's out of time, but can I ask one follow-up question about this? Sure, of course. I would have thought that the net prevailing party would say which side gets the judgment. And so if you had a case where the only issue was a lease and the plaintiff filed the lawsuit and said you owe me $600,000 and the ultimate ruling was you owe me $80,000, the party that got the judgment for the $80,000 would be the net prevailing party because that's whose favor the judgment is in. I would not have thought we did it the way you just suggested, which is to say, well, the defense really is better off by $520,000 or whatever the math is, and you only got $80,000. So am I missing it? Well, you're not missing it. It's just that the analysis, in my view, that you just provided is not quite on center to the case that we had here. Specifically, in the hypothetical you raised, if there was a single issue, it was just the plaintiff wanted $400,000, for example, and only got $80,000, they would still be the prevailing party, even though they didn't get everything they were asking for. They'd still be the prevailing party. If, however, there were cross-complaints and the plaintiff wanted $400,000 and the defendant wanted $200,000, say, and then the plaintiff only got $80,000 and the defendant got $200,000, the plaintiff wouldn't be the prevailing party. Got it. All right. And it's sort of complicated. If there were multiple issues, as there are here, you wouldn't analyze the entirety of the judgment to determine the net prevailing party because the entirety of the judgment doesn't carry with it the obligation to pay attorney's fees from the loser to the winner. That's only by a creature of contract, and the contracts that are in play are only with respect to the equipment leases, which is why the analysis on the net prevailing party should be limited to who's the net prevailing party with respect to those equipment leases. There was no fee provision on the operating loans. Correct. Yeah. There's no fee provision on any portion of this other than the equipment leases. Thank you. Thank you. Addressing the three points on counsel's brief, on Mr. Folk's, Zach EDM's brief that counsel brought up, just generally I want the court to understand, and we've objected in our briefing also, that many of the statements by counsel and much of their briefing is, without citation of the records, is actually contrary to what the record shows, contrary to what the district court found. And it's illustrated by each of these three points. The first issue on consulting fees, the argument is that consulting fees collected by Dr. Hines should be discouraged because of his behavior generally, because he committed constructive fraud in certain aspects. But the district court specifically found, it's in our brief, that the business advice given to Mr. Folk and Zach EDM, and Mrs. Folk for that matter, about this joint venture, Oklahoma EDM, was beneficial for them. And frankly, the business loans were beneficial. Otherwise, Zach EDM would have had no choice but to file bankruptcy at the start of 2005, or 2004 even. And so the district court specifically found factually that the actions by Dr. Hines were not constructive fraud in that respect, and there's no showing of clear error factually. You haven't talked today about the U.S. bank loan, but, and I have to tell you, I just don't get it. I take it you still assert, you did in your brief at least, you still assert that it was better for Zach EDM to pay the full debt than to have the debt forgiven and have to pay the tax. Yes. Because of the combination of the tax advantage of Zach EDM being able to write off those payments on its current taxes. Well, you don't write off the principal payment, you just, but. Well, no, you do. Because it's a payment of a judgment, and so you would write off the principal payment. And the second. Okay. Well, but the second aspect of it was that then it created a tax-free benefit to, of half of the profit being paid to Mr. Folk. Okay. So then the second point made by counsel, that getting the 500,000 operating loans was only necessary because of the leases, that's completely contrary to the record. The leases, the lease payments were completely subsumed in this Oklahoma EDM joint venture where the payments by Oklahoma EDM to Zach EDM for the lease payments was on a monthly basis that Oklahoma EDM covered all of those lease payments. So all of the lease payments were paid for within the joint venture, and at the end of five years, Oklahoma EDM showed a profit of $600,000. If the lease payments had been half as much, the savings would have been used by Zach EDM for other things, right? I mean, the money was still funneling the same way. Well, true, but what the district court found and shown in footnote 50 in particular and shown by the testimony of Shannon Gomez, who's not one of these competing parties, was that Mr. Folk was actually funneling money out of Zach EDM for his own personal expenses. I understand. He's doing other money. But the truth is, if the lease payments had been half as much, Zach EDM would have been better off. He might have used it for his own personal purposes, but he also might have used it to pay down the operating loans. Right. The amount for the sale leaseback transactions, the findings were clear that the cost, the purchase price for HAI to buy equipment from Zach EDM was set by Mr. Folk. It wasn't Dr. Hines saying that this is what we're going to pay or this is how much we owe. So there's no real connection, as argued by counsel on the basis of the record, to the operating loans and the leases. And it's directly contrary to what the district found, and like I say, the operating loans were – and keep in mind, the record is clear also that the remaining balance of the operating loans that were owed by Zach EDM were actually incurred from about July or August 2008 to January 2009. So all the prior operating loans were ultimately paid off by Zach EDM. So it was in this continuing aspect of the partnership, after the partial withdrawal agreement, that Hines Aviation continued to make operating loans to Zach EDM that were paid – owed back. And the final point on the life insurance, it's just a misunderstanding of the nature of insurance. This case was about the contractual obligation of Zach EDM and Mr. Folk to pay for the premium during the life of that policy during their business relationship. This is standard buy-sell insurance. As long as I understood it was term insurance, I was right with you. But if it's whole life, it's got a cash value now. Oh, and that's another argument raised by Mr. Folk that it's whole life. The evidence is absolutely contrary. Well, let's say Dr. Hines testified without any rebuttal by Mr. Folk of any documents to show otherwise that it was term, at all times term. So you're right. This case has been made difficult for the district court, frankly, and even on appeal, by the distortion of the facts by Mr. Folk and Zach EDM and his counsel without evidentiary basis, without record basis, frankly, oftentimes without legal basis. And so the evidence was in dispute because Mr. Folk claimed that it was some sort of ordinary or whole life. But Dr. Hines actually, and the advantage the district court had in this case was the very extensive documentary record. There were correspondence and contracts and signed e-mails and documents almost on a monthly, if not weekly, basis. And many of those documents made it absolutely clear that it was term insurance. So thank you very much. Thank you both for your presentations and arguments here today. The case of Sacramento EDM and Dan Folk versus Hines Aviation Industries is now submitted. That concludes our docket for this morning, and we will be in recess. Thank you.
judges: Tashima, Murguia, Hinkle